Good morning, Ariel Stern on behalf of Rushmore Loan Management Services. Your Honors, in this case, the debtors stripped Rushmore's lien after mailing notice of their motion to do so and every other paper and pleading filed in the bankruptcy court starting with the petition to the wrong address, and after their attorney ignored repeated instructions from Mrs. Donald's Moon to communicate with Rushmore. Despite that, the bankruptcy court incorrectly found that Rushmore was the one that deliberately shielded itself from knowing about its borrower's bankruptcy and improperly assessed punitive damages on the basis of that error. Today I would like to discuss the punitive damage board, the evidence supporting it, and the finding of emotional distress damages on behalf of Mr. Moon. The bankruptcy court's punitive damage determination, of course, found that Rushmore's policies and practices were reckless or callously disregarded the law and the rights of the Moons, and in order to reach that conclusion, the bankruptcy court had to conclude that a gap that we acknowledge existed in Rushmore's policies and procedures was deliberate. The bankruptcy court described it as a veil of ignorance that Rushmore used to insulate itself from notes, but where the bankruptcy court went wrong and where its determination that punitive damages were appropriated as both implausible and not supported by the actual evidence is that Mr. Younger, the witness for Rushmore, never said, ever, that the five methods, or sources, I should say, of bankruptcy information, so forth, from the policies and procedures, were exclusive. Mr. Younger never said that Rushmore would not consider any other sources, nor did he say that it wouldn't investigate other sources of information. Is there any evidence they did? Yes, Your Honor. I mean, they didn't stop doing it. They were told there was, I'm just, why do we care, well, go ahead, Judge Brant. I think anticipating the question a little bit, why do we care as to what the policies and procedures said, the bankruptcy judge determined essentially that, well, there was a gap in the policy and procedure that Rushmore could have done a patient search to verify what Mr. Moon said, that the central holding supporting the punitive damage assessment was that that gap was knowing that it was deliberate and that it was inconsistent with the written policy and procedure. So, if we look at the written policy and procedure, it says that these five sources of information that are listed are sources from which, and the word that they use is can, from which Rushmore can determine that one of its borrowers is in bankruptcy. The wording of the policy and procedure suggests that there's others and other places in the policy and procedure that actually says that Rushmore will consider information from any source. Counsel, wasn't the problem here that Rushmore clearly, although it could and might have done other things, its defense was based on the fact that the information they received didn't fall within the criteria of their policies and they purposely ignored it and didn't act on it, even though they might have, they chose not to. And that's what spurred the bankruptcy court to find that this was purposeful, intentional and reckless. Right. They didn't have to. The policy gave them an out, basically, from finding out what, whether or not there was a bankruptcy case. And the second part of what Judge Gahan and Judge Brand, everything that you just said, is in the bankruptcy court's memorandum of decision. The problem with it is that it's not supported by what Mr. Moon actually said. There's no question that there was an automatic state violation and we don't contest that on this appeal. The problem that we wish appellate review for is the bankruptcy court's conclusion that that gap was deliberate, that it was the result of reckless indifference to the rights of the borrowers. And that's the part where there's no support in the evidence for that conclusion. And so what Mr. Younger explained is that when information comes in from any source, but certainly from these five sources, what Rushmore is supposed to do per its own policies and procedures is to investigate and verify. And the context of the conversation of December 2014 becomes important here. What happened was that in the conversation with Rushmore's representative, Tracy, Mr. Moon told Tracy about the bankruptcy and Tracy, first of all, explained, well, Rushmore didn't know about the bankruptcy, which confirms that they do train their employees about the importance of bankruptcy. She also said, or Mr. Moon also said that Mr. Dawson, the Moon's bankruptcy attorney, had been instructed and would be instructed again to communicate with Rushmore. And so Mr. Younger explained that following that conversation, Rushmore continued to try and communicate with Mrs. Gunnels-Moon to verify and authorize Mr. Moon. They called the house and they again got Mr. Moon because Mr. Moon is home in the house and Mrs. Gunnels-Moon is not. But you know, you're arguing facts here, which is a tough road to hoe on appeal. All right. So let me back you up because, you know, I'm concerned about an issue that neither party really addressed well at the bankruptcy court or on your appellate lease. And that is, you know, clearly this day was violated as to Mrs. Gunnels-Moon. You continued collection activities. What was the violation of this day as to Mr. Moon, who the bulk of the general damages were awarded to Mr. Moon because he was the one who received all the phone calls and it activated and caused him distress through his PTSD. But what was the violation of this day as to him? Why is it a violation for him when the loan was first? And as we set forth in our briefing, Judge Brand, there was no violation of this day with respect to Mr. Moon. As both Mrs. Gunnels-Moon and Mr. Moon admitted, the loan was exclusively Mrs. Gunnels-Moon's obligation because of decisions that they had made at the time of origination. The property was titled in the name of Mrs. Gunnels-Moon and her daughter and was later, there was later a quick claim deed renouncing any community property interest. I'm really familiar with the fact that you don't need to. Understood. Understood, Your Honor. And so, as we set forth in our briefing and in the standing section, all of the conduct for which the bankruptcy court regressed Mr. Moon's alleged, or I shouldn't say alleged, the damages that the bankruptcy court found were caused by conduct that did not violate his state. We recognized that there was a state protecting him and his estate and the property in his estate. As we set forth and as the Ninth Circuit set forth, I should say, in the Brooks decision, simply because they're married, a husband and a wife, does not mean that they share the same automatic state or the same estate. But don't they share the same assets? I mean, I'm sure you're hearing that kind of thing because even if it's not a collection stay because he doesn't owe the debt, you're calling him and saying, pay it. You're going to lose the roof over your head if you don't. And please use community funds to do so. So why isn't that a 362A3 violation? A couple of reasons, Your Honor. First of all, three reasons, I would say. Factually, getting a little bit back into the facts here, there was no attempt to collect. There were calls that were made. Most were unanswered. But when they did discuss Rushmore, never in any of those calls actually requested payment. What did they request? Why are they calling them? That was not set forth. That was not established with 100% clarity in the evidentiary hearing. Likely it was because they were calling from the collection department. But in the December 2014 call, once Mr. Moon said they were in bankruptcy, there was no request. So there was there's actually no record here. I mean, the inquiry minds want to know, why does the collection department call if they're not trying to collect? I think, Your Honor, we're just seeing how you're doing. I mean, you know. But context here becomes important, we think. Well, once in that collection call, there was a statement that there was bankruptcy. There was no attempt to collect. But more generally speaking, in this instance, we also know that there's no community interest in the property. Not in that property, but if they're going to pay. I mean, the money that they used to pay comes from both their community assets, right? That was not established. And that was not established. I think because there was no actual attempt. It depends on what the community property law is in Nevada. If their income that they earn as married people is community property, and they use their income to pay their debt, isn't that community property? Let me ask you about this kind of zone of interest, protection of the automatic thing. Why isn't Mr. Moon protected by that? Because unlike the common law, Mrs. Paul's graph type of analysis, this is a statutory right. It's a right that arises under 362. And it is specific. Not everybody, as we explained in the Pekan Grove's case, the Ninth Circuit has said that not everybody who's injured by an automatic state violation has standing to pursue it. It has to be one of the beneficiaries. And in that Pekan Grove's case, the debtor and the trustee were identified as the specific beneficiaries. And so even a spouse, as we saw in the Brooks case, even a spouse lacks standing to do so. The only difference, I think, as far as the zone of interest goes, between this case and the Brooks case, is that in this case, we have a joint petition, and it's one case rather than two. But that's a procedural difference. Significant? I mean, you know, the code doesn't allow many joint cases, so. We don't think it's, for purposes of distinguishing this case from the Brooks case, the fact that procedurally speaking, we have one case where the debtors share filing fees where they should, because often with married couples, there's overlap in assets. And so it's administratively more convenient and efficient to do things jointly. But that does not transfer into substantive right where the spouse of the debtor comes into the zone of interest protected by the bankruptcy code. So for those reasons, we believe that Mr. Moon, and we challenge, as we say in our brief, the assessment of emotional distress damages, both under the elevated evidentiary standard of clear evidence, and particularly because the harm that he suffered postdated the discharge injunction. And so for all of those reasons, which I'm not going to have a whole lot of time to get into, we further challenge the, and request a reversal of what the bankruptcy court assessed in terms of the amount of damages. I'm down to three minutes, and I would like to reserve the remainder of the time if that's okay. You may. Thank you. Thank you. All right, Mr. Burke, I'll get you unmuted. Thank you. Good morning, and may it please the court, Christopher Burke, the Moons. Absent questions, I won't spend a lot of time on the appeal. I'll spend the majority of my time on the cross appeal. There's three reasons a bankruptcy court decision should be affirmed. First, Mr. Moon had standing. Second, the damages were reasonable. And third, the court had wide discretion to allow the expert to testify. Let's talk about standing, because as you can tell, that's an issue that really interests me. You know, where's this day violation for Mr. Moon? Provision of the code, specifically, protected him or was violated. Well, I would first point to 362A3. This is an act of taking possession of property of the state or a property from the estate. What's the specific property that you're talking about, though? His income, his wages. Yes, if you look at I and J, his income is used to pay the expenses along with his wife. So it's an attempt to collect that way. It's also an attempt to put a lien against the property. A property he lives in and contributes to. How is that? You stripped the lien, so how is it an attempt to put a lien on? It's not to put a lien on. It's to enforce a lien against property of the state, which is A4. By trying to collect on a lien that's been stripped, they're trying to enforce it. But he doesn't own it, right? He doesn't own the house. He just lives there, contributes to it. So it's his position. Okay, all right. And just to clarify under A3, it says to control any act to obtain possession of property of the estate or property from the estate. What act did they, other than the call, did they take to possess or obtain possession of property? They didn't garnish. They didn't seize any bank accounts. They didn't repossess any property. Those are the typical acts that we would see under an A3 violation, right? Right. It wasn't just calls. It was also letters that sought payment. But again, it's on the wife, right? I'm sorry, I didn't hear that. The payment's what? Was from the wife, not the husband. The letters were to the wife. Right. But he was home and he opened them and then he had to inform her and that created marital strife. Also, he would be within the zone of interest of the stay. It'd be an odd situation that a debtor can't use the stay in a bankruptcy case. I also mentioned A.H. Robbins and the unusual circumstance situation. There's no relationship closer than a husband and wife. The two become one. And in this situation, nothing's more glaring than that. But I also put out that they waived that argument. It was never brought up. They raised it in there. I looked at that. They raised it in their argument and there was some testimony regarding the ownership of the property and who was liable on the note. So, you know, waivers, I think a little bit of a hard argument to make. Okay, thank you. I appreciate the procedural posture that they didn't file any written pleadings at all at the bankruptcy court. And, you know, that didn't do any discovery or do any act, take any action to write people for the hearing. But all that being said. Okay, so moving on, the damages were reasonable. And I want to make a note about the punitive damages. It wasn't two to one. It's really two to 1.7. If you add in the attorney's fees as actual damages that came out later. So it's almost a one-to-one punitive damage ratio to actual damages. The attorney's fees are not before us now. They're for a later, you know, appeal. We don't really have that information. Okay, if there's no other questions on the actual appeal, I'd like to go to the cross appeal. Well, could you just address his point? I mean, he's saying that there was insufficient evidence on any number of areas below. In particular, he's trying to differentiate between the state of mind of, the corporate state of mind as saying, hey, they had discretion that wasn't implicit in the guidelines. And there was error and not acknowledging that point. Do you have anything to say to that? You're talking about their procedures? Yeah. Right. Well, the bottom line on that, they had, they list five ways to know. And their witness testified, he, Mr. Moon was unauthorized to give them that information. Now they can say, well, our procedures are beyond those five ways, but obviously Mr. Moon was unauthorized and he wasn't one of those ways. And they stuck to it. They held that position from the beginning. And the point to remember is they called the Moon's house at their home number. This wasn't a random person calling in and saying, hey, there's a bankruptcy here, watch out. No, they kept calling the Moon's house hundreds of times. And Mr. Moon testified at least 10 occasions. He told them about the bankruptcy. Now they'll say that's not in our records, but we pointed out that not every call is listed in their records that came out at trial. Any other questions regarding the appeal? So just to clarify, I understand your argument is that they had a policy that seemingly was flexible, but their actual action demonstrated that they stuck to a policy. Even in the face of actual knowledge, they refused to stop their conduct because they could discount that particular information under their policy. They said one thing, but they acted in a different way. And that's why they were punished. Is that a fair statement of what you're arguing? Yes, exactly. Said much better than I could. The point too is the judge said they had an unwritten policy of who they would accept information from. And it wasn't a rogue employee defense. It was, hey, this is our policy. He's unauthorized. We're not going to take action on it. In terms of the cross appeal, there's three reasons why the decision of the bankruptcy court should be reversed. First, the court never addressed the continuing stay violation argument. Second, the court could have found a date of discharge that Rushmore had an actual notice because of its willful blindness or constructive notice. They should have checked into it. In terms of the continuing stay violation, LeGrand is the case I would point to, Judge Klein's case. I won't beat it to death because I'm sure you're aware of it. But basically the same acts that violated the stay after the discharge was entered. And we're arguing that's a continuous stay violation and the court should have awarded damages from the point of the discharge injunction on as part of the stay violation. The court specifically said I'm going to cut down the 1240 days to 648 days until the discharge ended. Now the court said they did violate the discharge injunction by clear and convincing evidence. I just can't pick the day because Mr. Moon didn't remember what day it was. I'm saying we don't need that. Because of their willful blindness, and the court brought that up numerous times, they didn't use the word willful blindness, but the court basically said that several times. In fact, it was so clear Rushmore's opening brief lists willful blindness seven times. We weren't willfully blind. So the implication was Rushmore willfully blinded itself not only to the stay, but to the discharge. And if that's the case, then the discharge date should have been considered the date it was entered and the court could award damages from there. Second, they were also on constructive notice. After knowing of the stay and the bankruptcy, they should have looked into it. They had more than two and a half years or two years to do something. Instead, they just stuck to their practice. He's unauthorized. Let's just keep calling and sending. Can I ask a question though? Getting back to your first point. So in a situation then where the lender has turned a blind eye to the bankruptcy, do we just automatically assume that there's going to be a discharge entered in every bankruptcy case that's filed? Because they're usually, you know, in chapter 13 in particular, there isn't. Most cases don't make it to discharge. And isn't there a different standard for violation of the discharge injunction as opposed to the automatic stay it's a much higher standard. You have to have actual knowledge. So how can just turning a blind eye satisfy the discharge injunction standard? Well, the Moon decision came out of February 25th this year. And the Supreme Court Intel communication decision came up, I've seen either February 20th or February 26th, right around that time. And it specifically said willful blindness can still be considered actual knowledge. And so I'm saying using that standard, the court held there was a willful blindness without using that word, then they would have known of the discharge on that day. And the Supreme Court also in that opinion said constructive knowledge can be actual knowledge. You have a duty to look into stuff. So there are two bases. The court could have awarded damages by finding the discharge knowledge was on the discharge date it was entered based on those two prongs. But instead the court just said, I don't know the date because Mr. Moon didn't know the date. So I'm not gonna award damages. I'm saying that's the wrong standard. You held in essence is willful blindness. So that can be considered actual knowledge of the discharge. And the same thing with constructive knowledge. And in terms of the discharge being entered as opposed to a case being dismissed, well, you just look at SunQuest. They were only in chapter 13, three months. And the damages went on for years after. And so this would be no different if it was discharged. And the Moon shouldn't be penalized for getting a discharge and completing their plan. And that's what we're doing. Because if we said the state continued after the discharge in this case, because the same acts were being done, we wouldn't be hurting them as we are by saying, well, the discharge started, sorry, that's tough. And the court also said, this is the time Ms. Moon was most affected was after the discharge. She testified once the discharge came in, I thought, okay, I'd be relieved. Then she started getting frightened and the court implied it would have awarded damages for that. So on three bases- What's it required to? I mean, if we reverse, you're getting a chance to go back at the court. The court could within its own discretion, decide that it had adequately compensated the Moons for the totality of the harm and give them a nothing, correct? Understood, yes. What's the role? One piece that concerns me in this case, there's a third chair here and it is the Moon's attorney who didn't get the right address, didn't call the lender, didn't do much of anything in the case. How does that factor into the analysis in your view? The Moon's attorney had the PO box off by one number and the notice of the bankruptcy and stay was given orally. So it's not, and in fact, Rushmore says, we're not arguing there was no stay violation. So they knew of the stay orally. Now, whether they knew about it through the five or six mailings that were made at the bankruptcy court level. And when I say that the bankruptcy attorney there, he mailed it to five different addresses. It's hard to believe they didn't get any of them, but that's subject for a different case down the road in this. But the idea is they violated the stay, they knew verbally there was a bankruptcy. And so I don't think the letters and the notice play into it. Are there any other questions? Judge Brand? I'm fine. Judge Gann? No, I'm good. Thank you. All right. Thank you very much, Mr. Burke. All right. Mr. Sturm, you have two minutes and 54 seconds. Thank you, Judge Taylor. Addressing the question you just asked, here's how the Moon's bankruptcy attorney's actions play in two ways. One is that you really have to consider what went wrong here in order for Rushmore to not have notice of this. Obviously, the use of the wrong mailing address, the failure to call, despite what his client asked him to do. If the bankruptcy court were correct that Rushmore willfully blinded itself, you have to consider that there were other sources of notice, other fail-safe mechanisms that all failed. So this is a very small bail of ignorance. And that goes into what the bankruptcy court in its memorandum of decision actually criticized Rushmore's decision as both absurd and unpersuasive. But the problem was not with Rushmore's decision. The problem was that the judge drew the wrong conclusions from what Mr. Younger had said. And in response to Judge Gann's question as to what the bankruptcy court based its punitive damage determination of, it was not an inference that because of the conduct in this case, that that was the policy procedure. That's not how the memorandum of decision reads. What the judge said was it was based on what Mr. Moons said. In other words, it had been an isolated instance and there was no evidence that it was anything other than that. The Moons offered no evidence to show that this particular process gap has injured any other borrower, which differentiates this case from some of the other cases where large punitive damages were awarded. So that's where I think the Moons attorney's conduct comes into play over here is that it shows how unusual this case is and how unnecessary a large punitive award was in terms of deterrent because there were other ways that notice failed. At this point, I know you don't have a lot of time and maybe I'll give you another minute, but you keep saying that I'm having trouble putting your argument in the context of our limited range of motion on some of these issues on appeal. You know, the record seems to, is not lacking in support for the conclusions that the bankruptcy judge reached. You know, he could have reached a different conclusion. He simply didn't, number one. And number two, you know, you want him to sanction less based on sort of an esoteric, or based on the argument, maybe not esoteric, but this isn't as bad as Sunquist. I'll give you that. Nothing's as bad as Sunquist. And there are worse cases out there, but is that a metric that we on appeal even get to look at? You know, where is the line? So I'm going to give you another minute, add a minute to your time and let you answer that. Because I used- Yeah, thank you for the minute, Judge. I do need it. There's a couple of observations on that. First of all, we understand that we're constrained by the abusive discretion standard where the bankruptcy court does have a lot of leeway and the appellate review does not second-guess factual determinations. But there has to be some basis in the factual record for the conclusions inferences from the facts that the judge drew, the bankruptcy judge. And what happened is the bankruptcy judge made very specific and determined and actually narrowed factual determinations. He, for example, he found that Rushmore would not consider any source of information other than the five. And that's just not only did Mr. Moon not say that, he actually testified that the bankruptcy attorney, Mr. Dawson, had actually called that that would have been a way to verify. And tellingly, communications with the bankruptcy attorney is not one of the five sources of information listed in the policy. And so even within the abusive discretion standard, the conclusions here were both implausible and just the inferences that were drawn were not supported by what Mr. Younger testified. And so we understand that there is some limitation there. But even within that, even within that narrow standard, I think the court should reverse. And that's that's my minute. All right. Thank you. Judge Brand, do you have anything you wish to? Yes. Thank you. Thank you, Judge Taylor. So the panel would like the parties to submit supplemental briefs on the issue of violation of the automatic stay. Briefs of not more than 10 pages. And the issue is really, you know, what section of the automatic stay is or isn't violated? Mr. Burke says it's 362A3. So tell me how 362A3 is violated or is not violated. Address the zone of interest issue and address the issue of separate estates. We have separate estates here. They're not consolidated. What is the impact of that on the application of the automatic stay? In this case to Mr. Moon with respect to Mrs. Gunnell's Moon's death. Anything else that I missed? Judging on that. Oh, two weeks. Can you do that? Can you get it done in two weeks? Can I have three weeks? We've got some other appeals in this case going in. Am I restricted to 362A3? Because I did mention A4. You're not, A4 is fine. You can mention anything you want. Right. It's just pretty clear what we think is the possible hook. All right, 10 pages. Use it well. This matter will not be, will be deemed submitted when we receive the supplemental briefing. Each side will have three weeks as since Mr. Burke requested. So that will be October 7th. And I'm sorry, judges. I missed it. Is it 10 or 12 pages? 10. Let's keep it up, Ariel. Do my best. All right. Thank you very much for your good arguments. We look forward to the supplemental briefs. And as I said, we will, it'll be deemed submitted when those are received or on the, if you missed the deadline, on the deadline date. And we will endeavor to render our decision promptly. Thank you very much. Great. Thank you.
judges: Taylor, Brand, Gan